IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

<pre>
                                 *

SAINT ANNES DEVELOPMENT CO.,     *
LLC, et al.,
                                 *
     Plaintiffs,
                                 *
          v.                         CIVIL NO.:  WDQ-07-1056
                                 *
NEAL TRABICH, et al.,
                                 *
     Defendants.
                                 *
</pre>

*    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION

Saint Annes Development Company, LLC ("SADC") and Aaron
Young sued Neal and Terry Trabich (the "Trabiches") and Ronald
and Irene Coruzzi (the "Coruzzis") for fraud and breach of
contract.  A bench trial was held September 14-15, 2009.
Pending are SADC's fraud (Count 4) and conspiracy (Count 7)
claims against the Trabiches, Young's fraud (Count 5) and
constructive fraud (Count 6) claims against Neil Trabich, and
SADC's claim for attorney's fees under the Facility Agreement.[1]

---

[1] On April 24, 2007, SADC sued the Defendants for: breach of
contract (Count 1), anticipatory breach of contract (Count 2),
fraud (Counts 3 & 4), and conspiracy to defraud (Count 7).
Compl. ¶¶ 25-45, 58-61.  Young also sued Trabich individually
for fraud (Count 5) and constructive fraud (Count 6).  Id. ¶¶
46-57.  On May 21, 2008, the Court entered partial judgment in
favor of SADC against the Defendants, jointly and severally, for
breach of contract in the amount of $1,244,792.71, plus post-
judgment interest, and against the Trabiches for breach of

Proposed findings of fact and conclusions of law were filed by the Plaintiffs on January 25, 2010, Paper No. 212, and by the Trabiches on February 25, 2010, Paper No. 221. For the following reasons, the Court finds the Trabiches liable for fraud and awards damages to the Plaintiffs in the amount of $86,182.31 plus post-judgment interest and awards SADC attorneys' fees under ¶ 8 of the Facility Agreement in the amount of $116,227.99 plus post-judgment interest.

I.  Findings of Fact

As required by Fed. R. Civ. P. 52(a), the Court makes the following findings of fact:

1.  Aaron Young is a Maryland citizen, art dealer, and investor. Trial Tr. 349:7-356:4, Sept. 14-15, 2009.

2.  Peter Rubin is a Maryland citizen, an attorney licensed in Maryland, and Young's son-in-law. *Id*. 440:20-22, 452:3-18.

3.  SADC is a limited liability company; Young and Rubin are its only members. *Id*. 362:23-363:5.

---

contract in the amount of $1,750,000, plus post-judgment interest. Paper No. 86. On April 2, 2009, SADC notified the Court that it was abandoning: its fraud claim requesting rescission (Count 3) against all the Defendants, and its fraud and conspiracy claims (Counts 4 & 7) against the Coruzzis. Paper No. 170 at 7. Because the Defendants voluntarily dismissed the claims pending against the Coruzzis before trial, the Coruzzis' liability--except attorneys' fees due under ¶ 8 of the Facility Agreement--was completely resolved by the Court's May 21, 2008 Order.

4.  Neal Trabich ("Trabich") is a New York citizen, has a
    Masters in Business Administration from Columbia
    University, and is the founder and manager of Global
    Golf, Inc. ("Global Golf"), a New York corporation.
    *Id.* 32:11-17, 33:8-14, 34:2-22.

5.  Terry Trabich is Neal Trabich's wife, a citizen of New
    York, an interior designer, and the former owner of TS
    Design.  Terry Trabich Dep. 5:8-13, 107:16-108:13.

6.  The Corruzzis are citizens of Delaware.  Trial Tr.
    483:5-6; Compl. ¶¶ 6-7; Coruzzis' Answer ¶¶ 6-7.

7.  Ron Coruzzi ("Coruzzi") is the president of Signature
    Golf Management, Inc. ("Signature Golf").  Trial Tr.
    529:11-13.

8.  In 2000, Young met Trabich through a business
    associate, who thought Young might be interested in
    meeting with Trabich to discuss a business
    proposition.  *Id.* 174:17-19, 356:5-14.

9.  Global Golf had a contract with New York State to
    manage the Bethpage Golf Course and needed funds to
    complete renovations at the Bethpage driving range.
    *Id.* 34:7-36:22, 176:10-19.

10. On November 8, 2000, Global Golf borrowed $600,000
    from AP Links, LLC ("AP Links"), a company owned by
    Young and Rubin, and Trabich personally guaranteed the

loan (the "Bethpage Loan").  Trial Tr. 41:25-43:16;
Pl.'s Ex. 2.

11.  In a separate agreement entered that day, Global Golf
retained AP Links to provide consulting services on a
"part-time, as available basis" from May 2001 to
October 2016 for $720,000.00, payable in monthly
installments of $7,500.00 (the "Consulting
Agreement").  Pl.'s Ex. 3.

12.  The first clause of the Consulting Agreement states:
"Global [Golf] desires to make use of the service and
expertise of the Consultant with respect to certain
business of Global [Golf] on a consulting basis . . ."
*Id*.

13.  When he entered the Consulting Agreement, Trabich did
not intend Global Golf to use AP Link's consulting
services; he signed the Agreement without telling
Young and Ruben that the first clause was inaccurate.
Trial Tr. 46:4-23.

14.  Trabich believed that the Consulting Agreement
provided for disguised interest payments on the
Bethpage Loan, but he never expressed that belief to
Young or Rubin.  *Id*. 47:6-18.

15. Global Golf repaid the $600,000.00 Bethpage Loan with interest and paid the fees under the Consulting Agreement through October 2006. *Id*. 176:20-177:8.

16. From 2000 to 2006, Young and Trabich met regularly and developed mutual respect; Young felt they had a "great relationship" and considered Trabich a "close friend." *Id*. 146:7-8, 175:19-176:9, 359:8-25.

17. In 2001, Trabich and Coruzzi became involved in a project to build several golf courses throughout Virginia (the "Sam Snead Project"). *Id*. 178:17-179:4.

18. At Trabich and Coruzzi's request, Young and Rubin contributed $300,000 and became "equity participants" in the Sam Snead Project, which did not go forward. *Id*. 179:8-19.

19. Trabich agreed to repay Young and Rubin's investment in the Sam Snead Project and signed a promissory note to that effect on July 1, 2003. *Id*. 180:4-21, 416:1-12; Def.'s Ex. 8 at 7.

20. By July 1, 2006, that note had been repaid in full with interest. Trial Tr. 221:2-8, 416:16-19; Def. Ex. 8 at 1-3.

21. After the Sam Snead Project failed to materialize, Trabich and Coruzzi became involved in the development of a golf and residential community in Middletown,

Delaware (the "Saint Annes Project").  Trial Tr.
181:6-17.

22.  The Saint Annes Project planned to develop 435 single
     family homes, construct a new golf course, acquire
     control of two existing golf courses, and form the
     "Saint Annes Club." *Id*. 181:15-182:9.

23.  After Trabich and Coruzzi introduced them to the Saint
     Annes Project, Young and Rubin formed SADC.  *Id*.
     50:14-16, 362:23-363:1.

24.  On March 11, 2004, SADC contracted to purchase the
     residential lots in the Saint Annes Project (the "Lot
     Purchase Agreement") but exercised its right under
     that contract to terminate the deal in June 2004.
     Pl.'s Ex. 4-10.

25.  Trabich had expected to profit from the Lot Purchase
     Agreement and was upset that the deal had been
     terminated, estimating that it cost him and Coruzzi
     around $1,000,000.  Trial Tr. 50:12-16, 52:12-53:21.

26.  In August 2004, Trabich asked Young to lend him
     $300,000 and to arrange an additional loan or credit
     line of $1,000,000 to serve as a "back stop" for the
     Saint Annes Project.  Pl.'s Ex. 11.

27.  Young lent Trabich $300,000 but did not arrange the $1,000,000 line of credit.  Trial Tr. 364:2-365:15, 417:10-23.

28.  Because of unexpected delays in the Saint Annes Project, Coruzzi requested a $1,600,000.00 line of credit from Wilmington Savings Funds Society ("WSFS") in early 2006.  *Id*. 192:13-193:4.

29.  Trabich did not have the $500,000.00 security required by WSFS to obtain that line of credit, so he made another request to Young and Rubin for a line of credit.  *Id*. 193:5-20.

30.  In March 2006, Rubin visited the Saint Annes Project site and met with Trabich and Coruzzi to discuss the line of credit.  *Id*. 193:25-194:25; Def.'s Ex. 20.

31.  After that meeting, Rubin informed Trabich that he and Young were "willing to make [a $1,000,000] credit facility available to [Trabich and Coruzzi]."  Def.'s Ex. 20.

32.  Over the next two months, the parties negotiated the terms of the $1,000,000 credit facility agreement (the "Facility Agreement").  Pl.'s Exs. 15-24.

33.  The Trabiches were represented throughout the negotiations by attorneys from the Law Office of Mitchell J. Devack, PLLC.  Pl.'s Ex. 60.

34. Trabich wanted to receive the funds quickly and frequently contacted Young and Ruben for status updates.  Trial Tr. 69:2-71:2; Pl.'s Ex. 18-24.

35. On May 2, 2006, the Trabiches and Coruzzis entered into the Facility Agreement with SADC.  Pl.'s Ex. 25.

36. Under that Agreement, SADC promised to arrange a line of credit with a third-party lender to enable the Trabiches and Coruzzis to borrow up to $1,000,000 on a revolving line of credit.  Ex. 25 at 1.

37. As the "obligors," the Trabiches and Coruzzis promised to:

> use the funds borrowed from the Facility only to help finance the construction of the Saint Annes golf course, together with a 30,000 square foot clubhouse to be located on the golf course land, which is situated in the Town of Middletown, New Castle County, Delaware[.]

*Id.*

38. Paragraph 1(d) of the Facility Agreement reiterated that:

> any funds borrowed by the OBLIGORS under the Facility [would] be used only to finance the construction costs, improvements and other necessary expenses directly related to the [Saint Annes] Project.

*Id.*

39. Paragraph 10 of the Facility Agreement further provided that:

OBLIGORS acknowledge and warrant[] that (a) the obligations and covenants evidenced by this Agreement are incurred for the purpose of acquiring or carrying on a business or commercial enterprise and that such obligations and covenants are "commercial" within the meaning of Title 12 of the Commercial Law Article of the Annotated Code of Maryland (1990 Rep. Vol.) as amended; and (b) all proceeds arising from the Agreement will be used solely in connection with such business or commercial enterprise.

*Id.* at 5.

40. In consideration for arranging of the line of credit,

Paragraph 2 provided that:

(a) OBLIGORS shall pay SADC a fee of [10%] per annum upon all principal amounts borrowed by TRABICH from the Facility, which percentage shall accrue until such time as the borrowed principal is repaid to the [third-party lender] . . .[2]

(b) Commencing [60] days after termination of the Facility, TRABICH shall pay to SADC an annual consulting fee for a period of [20] years, which fee shall be [$100,000.00] for the first ten years after such termination, and [$75,000.00] per year for the final [10] year period.

(c) Peter Rubin and Aaron Young of SADC shall receive full non-transferable lifetime "Ambassador" memberships to the Saint Annes Club, and shall not be required to pay initiation fees, minimum dining fees or annual dues . . . .

*Id.* at 2.

---

[2] On June 8, 2006, the parties executed an Amendment to require the 10% per annum fees to be paid "on a semi-annual basis during the first year from the date upon which funds are first drawn by OBLIGORS" and "on a quarterly basis for each year thereafter." Pl.'s Ex. 32 at 1.

41.  Under ¶ 1(e), the Trabiches and Coruzzis promised to repay the third-party lender in full on or before December 31, 2009. *Id.* at 1-2.

42.  In the event of default, ¶ 5 allowed SADC to:

> (a) declare the entire outstanding Principal Amount, together with all accrued interest and all other sums due under the FACILITY AND THIS AGREEMENT, to be immediately due and payable . . . [and] (b) exercise its right to confess judgment against OBLIGORS . . . .

*Id.* at 3.

43.  Under the ¶ 8 "Collection Expenses" provision:

> [i]f any amount or obligation due under [the Facility] Agreement is placed in the hands of an attorney for collection following the occurrence of [a default], OBLIGORS agree to pay to SADC upon demand all costs and expenses, including, without limitation, all reasonable attorney's fees and court costs incurred by SADC in connection with the enforcement of this Agreement . . . .

*Id.* at 4.

44.  To secure the Trabiches' obligations under the Facility Agreement, Terry Trabich promised to deliver a subordinate mortgage on their home (the "Collateral Property") to SADC. *Id.* at 2.

45.  The Trabiches warranted that, at the time of the Facility Agreement, "the sole encumbrance upon the Collateral Property [was a] primary mortgage and accompanying lien held by Countrywide Home Loans,

Inc." and promised not to place or allow "any further liens or other encumbrances ahead of SADC and the Mortgage executed [in favor of] SADC as security for" the Facility Agreement. *Id*. at 3.

46. SADC agreed not to record the mortgage unless a default occurred and remained uncured for ten days after written notice, or it received written consent from either Neal or Terry Trabich. *Id*. at 2.

47. The Trabiches executed and delivered their mortgage to SADC. Pl.'s Ex. 27.

48. SADC did not record the mortgage. Trial Tr. 74:21-23.

49. SADC relied on Trabich's representation that he would "alert" Young if his financial situation deteriorated when it agreed not to record the Trabiches' mortgage. Trial Tr. 74:7-23, 373:4-374:12.

50. When he entered the Facility Agreement, Trabich knew that Young and Rubin had agreed to fund the credit facility based on the representations therein. *Id*. 72:3-12, 73:18-74:6, 75:13-23.

51. Trabich also knew that Young would be personally responsible if the money borrowed under the credit facility was not repaid. *Id*. 77:22-78:3.

52. Young would not have agreed to enter the Facility Agreement on behalf of SADC if he had known that the

Trabiches: (1) did not intend to use the funds borrowed for commercial purposes, *id.* 393:1-21; (2) believed the commercial purposes clause was inserted to avoid usury laws, *id.* 393:22-394:11; (3) did not intend that there would be consulting services, *id.* 392:1-13; (4) believed that the consulting fees were actually disguised interest payments, *id.* 393:22-394:11; and (5) thought the consulting arrangement was a "sham," *id.*

53. On May 3, 2006, Trabich wrote an email to Coruzzi with the subject "Pay Down Credit Model," which explained how the Saint Annes Project needed to operate in order to "pay Rubin back [the $1,000,000]" and "get out of debt." Def.'s Ex. 25; Trial Tr. 231:6-19.[3]

54. Because Young was unable to underwrite the credit facility quickly, Gerald David arranged the $1,000,000 credit facility with Wachovia. *Id.* 375:15-376:25.

55. Young, individually and on behalf of SADC, agreed to indemnify David for any losses from his involvement in the transaction. *Id.* 378:24-379:2; Pl.'s Ex. 30.

---

[3] On June 26, 2006, Trabich sent another email to Coruzzi with the subject "Wachovia Rubin Line," relaying a suggestion that the future payments on the credit line be made by direct deposit to the Bank. Def.'s Ex. 22.

56. Young also promised that Trabich would pay David, instead of SADC, the fees due under Paragraph 2(a) of the Facility Agreement and directly pay Wachovia the interest on the credit line. Pl.'s Ex. 30; Trial Tr. 379:15-23.

57. Trabich was aware of David's involvement in getting the credit facility. Pl.'s Ex. 29.

58. After execution of the Facility Agreement but before the credit facility became available, Young made a separate $300,000.00 loan to Trabich without documentation or restrictions on use of the funds. *Id*. 202:7-21, 431:25-432:10.

59. Around May 18, 2006, funds became available under the credit facility. *Id*. 431:25-432:2.

60. On May 24, 2006, Trabich withdrew $1,000,000 under the credit facility and deposited it in his personal bank account. *Id*. 75:2-12.

61. On May 25, 2006, Trabich repaid the $300,000 loan from Young made earlier that month. *Id*. 203:17-19.

62. An accounting prepared by Trabich later in 2006 shows that the loan proceeds were distributed as follows: $350,000 to Terry Trabich; $100,000 to Global Golf; $500,000 was deposited with WSFS as collateral for a $1,600,000.00 loan to the Saint Annes Project; and

$50,000 to construction expenses at the Saint Annes

Project (the "2006 Accounting"). Pl.'s Ex. 61; Trial

Tr. 81:9-90:24.

63. Between May and September 2006, the Trabiches'

financial position deteriorated, but they did not

inform Young or Rubin. Trial Tr. 94:15-20, 97:24-25.[4]

64. On September 1, 2006, Trabich prepared a personal

financial statement that did not list the $1,000,000

loan under the Facility Agreement as a liability but

listed the $500,000 deposit with WSFS as an asset.

*Id.* 100:13-102:6; Pl.'s Ex. 34.

65. That financial statement showed Trabich's net worth

was about $15,000,000 as of September 2006. Trial Tr.

103:17-20.[5]

66. In his September 8, 2009 email response to Young's

request for an update, Trabich acknowledged that the

builders were still behind schedule but wrote that the

"housing slowdown seems not to have affected the

---

[4] Trabich began winding down Global Golf in autumn 2006 because of "adverse market conditions, adverse governmental conditions, and adverse financial results." Pl.'s Ex. 53; Trial Tr. 165:24-168:10.

[5] Because this statement did not reflect the $1,000,000 loan from SADC, Trabich's actual net worth was $14,000,000.00 in September 2006. Trial Tr. 103:21-104:1. By November 1, 2007, the Trabiches' net worth had been reduced to $525,000, and Neil Trabich was earning about $350,000 per year as the Director of Golf for Confer Bethpage, Inc. Pl.'s Exs. 52 & 53.

[Saint] Annes development nor any of the surrounding developments[.]"  Pl.'s Ex. 35.

67.  Trabich retained Attorney Jay Russ in early October 2006.  Trial Tr. 98:1-15.

68.  Based on his conversations with Russ, Trabich believed that the AP Links Agreement and the Facility Agreement were usurious and thus unenforceable.  *Id*. 227:24-228:6.

69.  On November 3, 2006, Russ filed suit on behalf of the Trabiches and Global Golf against Rubin, Young, David, AP Links, SADC, and Wachovia Bank National Association (the "New York Action").  Pl.'s Ex. 39.[6]

70.  In a "Verification" attached to the complaint in the New York Action (the "New York Complaint"), Trabich swore to the truth of its allegations.  Pl.'s Ex. 39 at 27.[7]

71.  Through those allegations, Trabich swore that, in executing the Facility Agreement, he: (1) had no "expectation that any bona fide consulting arrangement

---

[6]  Although this action was filed on November 3, 2006, it was not served on the Defendants for several months.  *Id*. 127:19-22, 386:17-19.

[7]  Because Trabich signed the verification in his individual capacity, neither Terry Trabich nor Global Golf is bound by the statements alleged.

had actually been established or that any consulting
services would be provided by [SADC] . . . and none
were," *id*. ¶ 90; (2) had not intended that SADC,
Young, Rubin, or David would provide consulting
services, *id*. ¶ 92; and (3) "intended to contract for
the payment of interest greater than that amount of
interest which is permitted by law, and intended to
circumvent, avoid and violate the usury laws," *id*. ¶
98.[8]

72. Trabich also swore that the Facility Agreement "set
forth an alleged commercial and/or business purpose .
. . notwithstanding the fact that there was no
commercial or business purpose thereto" intended by
the Trabiches. *Id*. ¶ 103.

73. The New York Complaint sought, *inter alia*, a
declaration that the sums due under the Facility
Agreement "be forfeited." *Id*. ¶ 100.

---

[8]  In his December 3, 2007 affidavit, Trabich reasserted that:

[n]one of the parties to the [Facility Agreement] had an
expectation that any bona fide consulting arrangement had
been established or that any consulting services would be
provided by SADC, and in fact none w[as].  The consulting
agreement was a sham and a vehicle by which SADC and its
principals demanded and received 'interest.'  The parties
to the [Facility Agreement] and [its amendment] intended to
contract for the payment of 'interest' greater than the
amount of 'interest' allowed by applicable law.

Pl.'s Ex. 57 at 5.

74. Trabich did not serve the New York Complaint until several months later, in part, because he believed that Young would immediately record the Trabiches' mortgage upon notice of the suit. Trial Tr. 163:16-24.

75. On November 10, 2006, Young's assistant wrote to remind Trabich about an upcoming payment due to David under the Facility Agreement. Pl.'s Ex. 40.

76. Trabich responded with thanks for the reminder and a request for further payment details. *Id*.

77. After receiving another payment reminder from Young on November 20, 2006, Terry Trabich wrote to say that a check was being sent and should arrive at Young's office on November 22, 2006. Pl.'s Ex. 41.

78. Young wrote back to express his concern for Trabich, whom he considered a "friend" and knew was "stressing" over the Saint Annes Project. Pl.'s Ex. 42.

79. Young told Terry Trabich that he wanted to have a "catch up" with her husband and asked her to convey that he was "available whenever" and would "wait to hear from [Trabich]" at his convenience. *Id*.

80. On November 22, 2006, Young received the check promised by Terry Trabich, but it was post-dated. Pl.'s Ex. 43.

81. That day Young wrote to Trabich:

> [e]xtremely disappointed to receive a post dated
> check today . . . You knew this day was coming
> for six months and you pushed me beyond my
> comfort zone to get the [$1,000,000]. I did it
> out of friendship only! . . . I will wait until
> Monday and hope to receive a check that can be
> deposited. It must be in my hands on Monday[,]
> or I will trigger the default clause . . .
> [David] will not wait. This is a simple loan in
> his mind and if he is going to be aggravated then
> it is not worth it to him. I can[not] let his
> interest be unprotected as ultimately I am
> responsible.

*Id.*

82. On December 21, 2006, Terry Trabich borrowed $500,000 from Gordon Lenz and executed a mortgage on the Trabiches' residence in that amount in favor of Lenz (the "Lenz Mortgage"). Pl.'s Ex. 45-46; Trial Tr. 160:16-20.

83. The Lenz Mortgage was recorded on January 5, 2007. Pl.'s Ex. 68.

84. The Trabiches knew that granting this mortgage to Lenz was a violation of the Facility Agreement. Trial Tr. 158:9-16; Terry Trabich Dep. 421:16-422:5.

85. In late February 2007, Young received his first notice of the New York Complaint. *Id*. 127:19-22, 386:17-19.

86. In his capacity as counsel for the Trabiches in the New York Action, Russ swore by affidavit that the loan made under the Facility Agreement:

was personal, rather than commercial, in that it was made to [four] individuals for their personal use.  The use of the loan proceeds, however, was partially in relation to [the Saint Annes Project.]

Pl.'s Ex. 54 ¶ 9.

87.  On May 2, 2007, SADC began foreclosure proceedings against Terry Trabich in New York state court, seeking to foreclose on its mortgage to the Trabiches' residence (the "Foreclosure Action").  Pl.'s Ex. 89.

88.  In her verified answer in the Foreclosure Action, Terry Trabich swore that: (1) she had no "expectation that any bona fide consulting arrangement had actually been established or that any consulting services would be provided by [SADC]" under the Facility Agreement "and none were," Pl.'s Ex. 55 ¶ 28; (2) the Facility Agreement "set forth an alleged commercial and/or business purpose . . . notwithstanding the fact that there was no commercial or business purpose thereto," *id.* ¶ 41; (3) the reason for setting forth "an alleged commercial and/or business purpose . . . was to purportedly comply with the exemptions or exceptions of the applicable laws prohibiting usurious transactions," *id.* ¶ 42.

89.  Terry Trabich also asserted a counterclaim in her
     answer, which sought to enjoin SADC's enforcement of
     the Facility Agreement.  *Id.* ¶ 16.

90.  By affidavit signed December 26, 2007, Terry Trabich
     swore under oath that:

     > The Obligors borrowed monies as a personal loan
     > under the Facility Agreement.  There was no loan
     > to a business entity.  There was no assurance at
     > the time of the draw down of funds that the funds
     > borrowed would be used for commercial purposes.
     > The funds were not used for solely commercial
     > purposes and no steps were taken by [SADC] to
     > assure that they were.

     Pl.'s Ex. 56 ¶ 6.

91.  On December 14, 2007, SADC repaid Wachovia
     $1,012,292.71 to pay off the principal, accrued
     interest, and costs on the loan under the Facility
     Agreement.  Pl.'s Ex. 59; Trial Tr. 395:24-396:14.

92.  To obtain the funds to pay off that loan, Young
     borrowed $1,012,292.71 against his line of credit with
     PNC Bank (the "PNC Loan") and transferred those funds
     to SADC.  Trial Tr. 396:1-10.

93.  Through trial, Young has paid $66,182.31 in interest
     on the PNC Loan.  Pl.'s Ex. 64.

94.  On August 12, 2008, Trabich pled guilty to second
     degree grand larceny, second degree forgery, offering
     a false instrument in the first degree, and second

degree bribery in New York State Court. Trial Tr. 297:25-298:16.[9]

95. The parties have stipulated that attorneys' fees and costs incurred under ¶ 8 of the Facility Agreement in the amount of $116,227.99 are fair and reasonable. Paper No. 211.[10]

II. Conclusions of Law[11]

A. Fraud (Counts 4 & 5)

To prove fraud, a plaintiff must show by clear and convincing evidence that: (1) the defendant made a false

---

[9] On March 31, 2009, Trabich was sentenced to four months imprisonment, *see* Paper No. 172; he served an 80-day jail term, *see* Paper No. 221 ¶ 140.

[10] Rivkin Radler, LLP represented SADC in the New York Action, which challenged the validity of the Facility Agreement. *See* Steven B. Gould Aff. ¶¶ 4-5, Jan. 25, 2010. Brown & Gould, LLP represented SADC in this action. *Id*. ¶ 5. SADC provided detailed billing records and summary spreadsheets from both firms. Pl.'s Exs. 65 & 66. Steven B. Gould, a partner at Brown & Gould, reviewed all of the invoices and "backed out" fees that he "determined were not incurred in connection with the defense of the validity of the Facility Agreement or the prosecution of SADC's breach of contract claim." Gould Aff. ¶ 7. Peter Rubin also reviewed the invoices submitted and has sworn that "each invoice has in fact been paid." Peter Rubin Aff. ¶¶ 2-3, Dec. 10, 2009. Upon review, this Court finds the attorneys' fees and costs stipulated to by the parties under ¶ 8 of the Facility Agreement are reasonable.

[11] Under Maryland choice of law rules, tort claims are governed by the law of the state where the injury occurred. *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 752 A.2d 200, 230-31 (Md. 2000). Here, the parties appear to agree that the torts alleged occurred in Maryland.

representation to the plaintiff, (2) the defendant knew the representation was false or made it with reckless indifference as to its truth, (3) the purpose of the misrepresentation was to defraud the plaintiff, (4) the plaintiff relied on the misrepresentation[12] and had the right to rely on it, and (5) the plaintiff suffered compensable injury resulting from the misrepresentation. *Maryland Envtl. Trust v. Gaynor*, 370 Md. 89, 803 A.2d 512, 516 (Md. 2002)(*quoting Nails v. S & R Inc.*, 334 Md. 398, 639 A.2d 660, 668 (Md. 1994)).

Because fraud involves misrepresentation of a present or preexisting fact, a plaintiff must prove that the defendant did not intend to uphold the promise at the time it was made. *See Levin v. Singer*, 227 Md. 47, 175 A.2d 423, 432 (Md. 1961).[13] Fraudulent intent can be inferred from circumstantial evidence. *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md. App. 97, 838 A.2d 404, 440 (Md. Ct. Spec. App. 2003). In

---

[12] "[T]he misrepresentation need not have been the only motivation for the plaintiff's actions," but it must have "substantially induced the plaintiff to act." *Nails*, 639 A.2d at 669.

[13] Although "fraud cannot be predicated on statements [that] are merely promissory in nature[] or upon expressions as to what will happen in the future . . . [it] may be predicated on promises made with a present intention not to perform them." *Levin*, 175 A.2d at 432; *see also Gross v. Sussex Inc.*, 332 Md. 247, 630 A.2d 1156, 1161-62 (Md. 1993) ("[M]aking a promise as to a matter material to the bargain with no intention to fulfill it is an actionable fraud.").

weighing such evidence, Maryland courts consider "the situation
of the parties, the relations existing between them, the
activity of the promisor in procuring the instrument, and the
failure of the promisor to perform." *Tufts v. Poore*, 219 Md. 1,
147 A.2d 717, 722 (Md. 1959). "[A] failure or refusal to
perform is strong evidence of an intent not to perform the
promise at the time it was made . . . [when] only a short period
of time elapses between the making of the promise and the
failure or refusal to perform it, and there is no change in the
circumstances." *First Union,* 838 A.2d at 439 (*quoting Tufts*,
147 A.2d at 722).[14]

The complaint alleges that the Trabiches committed fraud by
falsely representing their intent to fulfill material terms of
the Facility Agreement. At trial, the Plaintiffs established by
clear and convincing evidence that (1) Trabich knew that Young

---

[14] "Maryland differentiates between intentional breach and fraud
with good reason. Contracts are often breached when companies
change their business direction because of competitive market
forces. Business persons entering contracts know and expect
this. Many times, because the parties anticipate potential
breach, contracts provide for liquidated damages and/or
attorney's fees if breach occurs. The law provides a remedy for
breach. Businesses will be hesitant to enter contracts at all
if a breach, without evidence of pre-existing fraudulent intent,
can expose them to punitive damage awards." *First Union*, 838
A.2d at 441. Thus, "[a] fraudulent pre-existing intent not to
perform a promise made cannot be inferred from the failure to
perform a promise alone," but "it may be considered with the
subsequent conduct of the promisor and the other circumstances
surrounding the transaction[.]" *Tufts*, 147 A.2d at 722.

and Rubin entered the Facility Agreement based, at least in part, on the commercial purpose and restricted use of the funds; (2) Young would not have agreed to the credit facility had he known the Trabiches did not intend to use the funds borrowed for commercial purposes; and (3) Young and SADC suffered losses in the amount of $1,078,475.02, representing the principal and accrued interest on the loan from PNC Bank used to pay off the credit facility loan. The Plaintiffs also sought to show that the Trabiches entered the Facility Agreement without the intent to use the funds taken out under the credit facility for the Saint Annes Project or to repay those funds. The Trabiches argue that there is insufficient evidence of their intent not to perform at the time they entered the Facility Agreement.

The Facility Agreement states that the credit facility was for "business or commercial" purposes[15] and that its funds were to be used *exclusively* for the Saint Annes Project.[16] In the New York Action, the Trabiches asserted that the loan made under the Facility Agreement was "personal" and not commercial and that

---

[15] Because they were not distinguished by the parties, the Court assumes that "business purposes" and "commercial purposes" are synonymous.

[16] Under ¶ 1(d) of the Facility Agreement, the funds borrowed were to be used "only" to "directly" finance the Saint Annes Project. Paragraph 10 further provided that the credit facility would be used "solely" for business and commercial purposes. Paragraph 1(e) required repayment of any funds taken out under the credit facility by December 31, 2009.

24

the funds received were used only "partially in relation to" the Saint Annes Project. The Trabiches have each admitted in sworn statements that, despite the express language in ¶ 10, they did not intend the Facility Agreement to have a commercial purpose. Terry Trabich has further sworn that "the funds were not used for solely commercial purposes," a statement corroborated by Trabich's 2006 Accounting. Although the entries in that 2006 Accounting are imprecise, the $100,000.00 disbursement to Global Golf and the $350,000 disbursed directly to Terry Trabich appear to violate ¶ 1(d) of the Facility Agreement.

To rebut this evidence, the Trabiches argue that they complied with the restriction on the use of funds and provided an accounting to show that $1,000,000 was invested in the Saint Annes Project after execution of the Facility Agreement. *See* Def.'s Ex. 2-5; Paper No. 221 at 15-18, 32-34. The Trabiches' financial records show frequent and poorly documented exchanges of money among various businesses and individuals; thus, it is difficult to determine how much money was transferred to and then actually invested in the Saint Annes Project.[17] These

---

[17] Global Golf made several of the payments that the Trabiches have attributed to the $1,000,000 paid into the Saint Annes Project. But Global Golf was not involved in the Saint Annes Project, Trial Tr. 83:19-22, and should not have received funds under the Facility Agreement. The Defendants have not shown why those payments should be attributed to funds obtained under the credit facility.

calculations--provided to opposing counsel only weeks before trial--also contradict the 2006 Accounting, which Trabich prepared shortly after he received the funds.  This Court does not believe the Trabiches' evidence or calculations.

Considering the questionable disbursements and the Trabiches' sworn statements that the funds were not used solely for commercial purposes, there is clear and convincing evidence that, at the time they entered the Facility Agreement, the Trabiches did not intend to use the funds for commercial purposes and exclusively to fund the Saint Annes Project.[18]  The Trabiches are liable for fraud based on their false representations in the Facility Agreement, regarding the use and purposes of the funds.  Judgment will be entered for SADC on Count 4 and for Young on Count 5.  The Trabiches shall be

---

[18]  The Plaintiffs have also argued that the Trabiches never intended to repay the funds taken from the credit facility in direct violation of ¶ 1(e).  But, the day after the Trabiches entered the Facility Agreement, Trabich sent Coruzzi an email explaining how the Saint Annes Project needed to operate to "pay Rubin back [the $1,000,000]" and "get out of debt."  The Trabiches and Coruzzis also made several of the initial payments under the Facility Agreement.  Because the parties agree that the Trabiches financial situation deteriorated significantly in the fall of 2006, a fraudulent pre-existing intent not to perform may not be inferred from their failure to perform the promises in the Facility Agreement alone.  On these facts, the Plaintiffs have failed to prove by clear and convincing evidence that the Trabiches never intended to repay the loan.

jointly and severally liable for compensatory damages in the

amount of $66,182.31 plus post-judgment interest.[19]

B.    Constructive Fraud (Count 6)

Constructive fraud is:

> [A] breach of a legal or equitable duty which,
> irrespective of the moral guilt of the fraud feasor,
> the law declares fraudulent because of its tendency to
> deceive others, to violate public or private
> confidence or to injure public interests.  Neither
> actual dishonesty nor intent to deceive is an
> essential element of constructive fraud.

*Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 652 A.2d 1117,

1127 n.11 (Md. 1995).[20]  Constructive fraud "usually arises from

a breach of duty whe[n] a relationship of trust and confidence

exists."  *Crawford v. Mindel*, 57 Md. App. 111, 469 A.2d 454, 459

(Md. Ct. Spec. App. 1984).  "Whe[n] . . . a party is justified

in believing that the other party will not act in a manner

adverse or inconsistent with the reposing party's interest or

---

[19]  Because the Court has already awarded damages for breach of
contract that include the principal amount due to Wachovia for
funds taken out under the credit facility, *see* Paper No. 85 at
6, 17, the Plaintiffs have been compensated for those losses,
and the Court will not award double recovery.  It appears that
Young paid the interest on the PNC Loan; thus, $66,182.31 in
compensatory damages will be awarded to him for that interest
payment.

[20]  "In equity, fraud 'includes all acts, omissions, and
concealments which involve a breach of legal or equitable duty,
trust, or confidence, justly reposed, and are injurious to
another, or by which an undue and unconscientious advantage is
taken of another.'" *Alleco v. Harry & Jeanette Weinberg Found.*,
340 Md. 176, 665 A.2d 1038, 1049 n.6 (Md. 1995) (*quoting* 1
Story, *Equity Jurisprudence* § 263 (14th ed. 1918)).

welfare, constructive fraud may be found to arise from a violation of this belief." *Id*. Constructive fraud must be proved by clear and convincing evidence. *Jeffcoat v. Jeffcoat*, 102 Md. App. 301, 649 A.2d 1137, 1139 (Md. Ct. Spec. App. 1994).

Here, Young and Trabich dispute whether they were in a confidential relationship when they entered the Facility Agreement. Although Young has testified that he considered Trabich to be a good friend, Trabich contends that he and Young had "nothing more" than a business relationship and the Facility Agreement was an arm's length transaction. Paper No. 221 ¶¶ 120-130.

"[A] confidential relationship exists whe[n] one party has dominion over the other person, and the relationship is such that the person with greater influence is expected to act in the best interest of the other person." *Brass Metal Prods. v. E-J Enters.*, 189 Md. App. 310, 984 A.2d 361, 388 (Md. Ct. Spec. App. 2009).[21] Such relationships may arise when "a party is, under the existing circumstances, justified in believing that the other party will not act in a manner adverse or inconsistent with the reposing party's interest or welfare." *Midler v. Shapiro*, 33 Md. App. 264, 364 A.2d 99, 103 (Md. Ct. Spec. App.

---

[21] "Confidential relationships can be found in attorney-client relationships, trustee-beneficiary relationships, and in some family relationships." *Brass Metal*, 189 Md. App. at 388.

1976).  "The mere fact that one reposes trust and confidence in another's integrity does not create a confidential relation-ship."  *Brass Metal*, 984 A.2d at 389 (*quoting Williams v. Dresser Indus., Inc.,* 120 F.3d 1163, 1168 (11th Cir. 1997)).

Generally, business relationships are not confidential relationships unless "[c]ertain factors above and beyond a typical business relationship" exist.  *Id*. at 388.[22]  For example, a confidential relationship may exist when the parties have a close personal relationship that precedes the business relationship.  *See id*. at 389 (*citing Gilmore v. Bell*, 478 S.E.2d 609, 611 (Ga. Ct. App. 1996)).  Also, a confidential relationship may exist in a business relationship if one party gains influence and superiority as a result of the confidence placed in him by the other party.  *Id*. at 389 (*quoting Nolen v. Hall*, 130 Ill. App.2d 867, 266 N.E.2d 141, 145 (Ill. App. Ct. 1970)).  By contrast, arm's length transactions between parties seeking to further their own objectives are not consistent with a confidential relationship.  *Id*. at 388-89.

Young argues that Trabich owed him duties arising from their confidential relationship.  But there is no evidence that

---

[22]  "The fact that one businessman trusts another and relies on another to perform a contract does not give rise to a confidential relationship, because something apart from the transaction between the parties is required."  *Id*. (*quoting Exxon Corp. v. Breezevale, Ltd*., 82 S.W.3d 429, 443 (Tex. Ct. App. 2002)).

Trabich (1) had a close, personal friendship with Young that preexisted their business dealings[23] or (2) exercised the dominion and influence over Young that would establish a confidential relationship. It was Young--the lender--and not Trabich--the borrower--who controlled whether to fund the credit facility. Furthermore, the Facility Agreement appears to have been an "arm's length" transaction, as it was a formal contract negotiated over two-months among the parties and their attorneys, which stated precise conditions for the repayment and use of the funds.

Although their dealings may have led Young to trust Trabich, this is insufficient to transform a business transaction into a confidential relationship. *See Brass Metal Prods.*, 984 A.2d at 390.[24] Because Young has not established that he and Trabich were in a confidential relationship, the constructive fraud claim will be denied.

---

[23] Young was introduced to Trabich to discuss a business deal, which resulted in the Bethpage Loan and Consulting Agreement; thus, the first interaction between the two men was in the context of that business transaction.

[24] There is no evidence of a familial relationship or friendship between the parties that preexisted their business dealings. Thus, their regard for one another does not appear to be the respect of colleagues built over a series of mutually beneficial business transactions and is not the fruit of an independent personal relationship.

C.   Civil Conspiracy (Count 7)

A civil conspiracy is an agreement or understanding between two or more persons to accomplish an unlawful act, or to use unlawful means to accomplish a lawful act, that damages the plaintiff.  *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 892 A.2d 479, 485 (Md. 2006) (citations omitted).[25]  To prove civil conspiracy, a plaintiff must show (1) an unlawful agreement, (2) the commission of an overt act in furtherance of the agreement, and (3) actual injury suffered by the plaintiff as a result. *Id*.  By itself, the unlawful agreement is not actionable; instead, the "[t]ort actually lies in the act causing harm to the plaintiff."  *Id*. (internal quotation omitted).  "Thus, civil conspiracy is not capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff."  *Id*.  (internal citations and quotations omitted).

SADC has argued that the similarity of the Trabiches' sworn statements about their intended use of the funds under the Facility Agreement is evidence of their unlawful agreement. Statements in legal papers are typically prepared by a party's

---

[25] *See also W. Maryland Dairy v. Chenowith*, 180 Md. 236, 23 A.2d 660, 664 (Md. 1942) ("A fraudulent conspiracy, sufficient to serve as the basis for an action in a civil case, is the confederation of two or more persons to cheat and defraud, when the design has actually been executed by the confederates with resulting damage to their victim.").

31

attorney; these similarities are insufficient circumstantial evidence of an agreement between the Trabiches to defraud SADC.

D.   Punitive Damages

In Maryland, "actual malice must be proven for recovery of punitive damages in an action for fraud." *Ellerin*, 652 A.2d at 1127.  Clear and convincing evidence of actual malice is required.  *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 633, 657 (Md. 1992).  "[A] person's actual knowledge that his statement is false, coupled with his intent to deceive another by means of that statement, constitutes the 'actual malice' required for the availability of punitive damages." *Ellerin*, 652 A.2d at 1129.  Thus, "[w]hat is needed to support an award of punitive damages is conscious and deliberate wrongdoing." *Hoffman v. Stamper*, 385 Md. 1, 867 A.2d 276, 301 (Md. 2005).

As explained above, there is clear and convincing evidence that the Trabiches made knowing misrepresentations about the intended use and purposes of the credit facility with the intent to deceive the Plaintiffs.  Accordingly, punitive damages are available.

To determine the amount of punitive damages, Maryland courts consider a defendant's "degree of culpability" and "ability to pay." *Ellerin*, 652 A.2d at 1130 (*quoting Embrey v. Holly*, 293 Md. 128, 141-42, 442 A.2d 966, 973 (Md. 1982)).  The

purpose of punitive damages is not to compensate the plaintiff but to punish and deter the wrongdoer. *Exxon Corp. v. Yarema*, 69 Md. App. 124, 516 A.2d 990, 997 (Md. Ct. Spec. App. 1986). Accordingly, "punitive damage awards must not be disproportionate to the gravity of the defendant's wrong." *Ellerin*, 652 A.2d at 1129.

Because the evidence demonstrates fraud and actions to hide the fraud--by failing to give immediate notice of the New York Complaint--the Plaintiffs contend that the Court should award $1,000,000 in punitive damages to deter the Trabiches from future misconduct. The Trabiches argue that, given the contract damages awarded and Trabich's recent incarceration, they have no ability to pay a punitive damage award.

On May 21, 2008, this Court awarded compensatory damages against the Trabiches in the amount of $2,994,792.71 plus post-judgment interest.[26] With the additional $66,182.31 fraud award, the compensatory damages assessed against the Trabiches in this action will total $3,060,975.02. The Trabiches' most recent financial statement, from November 1, 2007, indicates a combined net worth of $525,000 and Mr. Trabich's annual salary of $350,000-$380,000. Given this evidence, the Court finds that

---

[26] Of that total award, the Coruzzis are jointly and severally liable for $1,244,792.71 plus post-judgment interest.

33

the Trabiches have the ability to pay only a modest punitive damages award.

The purpose of punitive damages is to punish and deter "heinous" or "outrageous" conduct. *Ellerin*, 652 A.2d at 1130 n.13. Here, the Trabiches conduct, although deceptive and worthy of deterrence, does not under the circumstances justify an award of punitive damages that they have no apparent ability to pay.

To assess appropriate punitive damages in private actions involving "commercial" fraud, Maryland courts may consider the criminal fines imposed for similar offenses as an indication of the public policy interest in deterring such offenses. *See id.* (*citing Embrey v. Holly*, 293 Md. 128, 442 A.2d 966, 973 (Md. 1982)). Under Title 4 of the Criminal Law Article, the maximum penalty for a crime involving "commercial fraud" is $10,000. *See* Md. Code Ann., Crim. Law §§ 8-401 to 8-408. Considering the Trabiches' limited financial resources and the public policy interest in deterring fraud, the Court will award punitive damages (1) to Young against Trabich in the amount of $10,000, and (2) to SADC against the Trabiches, jointly and severally, in the amount of $10,000.

E.   Attorneys Fees

Having prevailed on its breach of contract claim, *see* Paper No. 86, SADC is entitled to collect its reasonable attorneys'

fees and expenses under ¶ 8 of the Facility Agreement.  The parties have stipulated, and this Court finds,[27] that fees and expenses incurred under that Paragraph in the amount of $116,227.99 are fair and reasonable.  Accordingly, judgment shall be entered in favor of SADC against the Defendants, jointly and severally, in the amount of $116,227.99 plus post-judgment interest.

III. Conclusion

For the reasons stated above, the Court finds the Trabiches liable for fraud and awards compensatory damages to Young in the amount of $66,182.31 plus post-judgment interest at the legal rate and punitive damages to SADC and Young in the amount of $10,000 each plus post-judgment interest at the legal rate.  The Defendants will pay SADC's attorneys' fees under ¶ 8 of the Facility Agreement in the amount of $116,227.99 plus post-judgment interest at the legal rate.


August 23, 2010                    _____/s/_____
Date                               William D. Quarles, Jr.
                                   United States District Judge

---

[27]  *See supra* note 9.